**TRENK, DiPASQUALE,**
**DELLA FERA & SODONO, P.C.**
347 Mt. Pleasant Avenue, Suite 300
West Orange, NJ 07052
(973) 243-8600
Anthony Sodono, III
Sam Della Fera, Jr.
Joao F. Magalhaes
*Proposed Counsel to North Jersey Community*
*Coordinated Child Care Agency, Inc.,*
*Chapter 11 Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| NORTH JERSEY COMMUNITY COORDINATED CHILD CARE AGENCY, INC., | Case No. 14-20256 |
| Debtor. | |

**CERTIFICATION OF ARNOLD GRANT, DEBTOR'S FINANCE DIRECTOR, IN SUPPORT OF FIRST DAY MATTERS**

Arnold Grant, pursuant to 28 U.S.C. § 1746, hereby certifies as follows:

1.    I am the Finance Director of North Jersey Community Coordinated Child Care Agency, Inc., the Chapter 11 debtor and debtor-in-possession herein (the "Debtor" or "NJCCCCA"), and as such am familiar with the facts set forth below.

2.    I submit this Certification in support of the following first day matters:

    i.    Motion for Expedited Consideration of First Day Matters;

    ii.    Motion for an Order Authorizing the Interim and Final Use of Cash Collateral;

    iii.    Motion for an Order Authorizing Debtor to Continue Using Existing Cash Management System, Bank Accounts, and Business Forms Pursuant to 11 U.S.C. §§ 105(a) and 363(c);

1

iv.      Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 507(a)(4) and 507(a)(5): (I) Authorizing the Debtor to Pay Pre-Petition Wages, Salaries, Withholding and Payroll-Related Taxes for Pre-Petition Periods; (II) Directing All Banks to Honor Pre-Petition Checks for Payment of Pre-Petition Employee Obligations; and (III) Authorizing the Debtor to Honor Workers' Compensation and Certain Employee Benefit Obligations;

v.      Motion for a Bridge Order and a Final Order (I) Prohibiting Utility Companies From Discontinuing, Altering or Refusing Service, (II) Deeming Utility Companies to Have Adequate Assurance of Payment; and (III) Establishing Procedures for Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. §§ 105(a) and 366; and

vi.      Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 507(a)(7) Authorizing Continuation of Certain Custom Practices.

## I.    Debtor's Business, Structure, and Operations

3.      The Debtor is a New Jersey non-profit corporation incorporated on May 11, 1972.[1] The Debtor is also tax-exempt organization under section 501(c)(3) of the Internal Revenue Code.

4.      The Debtor's principal place of business is 101 Oliver Street, Paterson, New Jersey 07501 ("101 Oliver Street"),[2] whereat the Debtor operates a childcare learning center, Michael's Energy Factory Education Center ("Michael's").

5.      The Debtor was originally a resource and referral agency for New Jersey's Passaic and Hudson Counties for the administration of state-funded childcare voucher programs. In 1998, the Debtor began operating two childcare centers in Paterson, New Jersey: Michael's at 101 Oliver Street, and Barney's Education Center ("Barney's") at 55 Main Street. At its peak, the Debtor had annual revenues of over $40 million. As discussed in greater detail below,

---

[1] The Debtor was originally incorporated as the "Passaic County Child Care Coordinating Agency."

[2] 101 Oliver Street is owned by the Debtor, and represents the Debtor's primary asset.

however, the Debtor is currently a smaller enterprise due to a state-mandated split of operations, along with the closing of Barney's following Hurricane Irene.

6.      Presently, the Debtor, through Michael's, is dedicated to providing high-quality, early childhood development and related child/family support services that improve the quality of life for children and their families in a high-need community through the delivery of programs that respect and respond to their individual needs and diversity.

7.      With 13 pre-school classrooms and 4 toddler classrooms, Michael's is one of the largest education centers in its geographical area.  During the school year it serves almost 300 children per day between the ages of 18 months and 5 years.  Also, on a daily basis the center also provides nearly 600 hot meals to its children, at no charge, as part of a well-rounded program.[3]

8.      The Debtor employs a devoted team of 65 employees.

9.      The Debtor has four primary sources of revenue:

i.      annual contract for <u>Abbott</u> preschool services with Paterson Public Schools (the "School District") (approximately $217,000 per month);

ii.     Department of Agriculture subsidies (approximately $20,000 per month);

iii.    New Jersey state vouchers for "wraparound" services (pre-8:30 a.m. and post-3:00 p.m. childcare) (approximately $50,000 per month); and

iv.     parent co-pays (approximately $10,000 per month).

10.     The Debtor's operations and affairs are overseen by a diverse and respected Board of Directors that volunteer their time without compensation.  The Chairman of the Board is Mr. Michael Lillo, principal of Synergy In Media.

---

[3] More information about Michael's mission can be found at www.michaelsenergyfactory.org.

3

11.    I oversee the Debtor's finances as the Finance Director.  I hold a Masters of Business Administration in Accounting.  My annual salary is approximately $63,000.

12.    The daily operations of Michael's itself are overseen by Ms. Yolanda DeStefano, the Center Director, who holds several degrees, including Educational Management.  Ms. DeStefano's annual salary is approximately $80,000.

13.    The Debtor is in full compliance with the laws, rules and regulations governing its childcare operations; specifically:

     i.    there are no active state or other governmental violations;

     ii.    the Debtor's childcare center license is current;[4] and

     iii.    all payroll taxes are current.

14.    The Debtor maintains a full a spectrum of all necessary and appropriate insurance policies including liability, property, workers compensation, auto and directors and officers insurance.

## II.    Reasons for Bankruptcy Filing

15.    Prior to the Debtor's bankruptcy filing, the Debtor exerted considerable effort and due diligence to both achieve out-of-court workouts with its creditors, as well as to obtain financing to resolve outstanding creditor claims.  Unfortunately, the Debtor was unsuccessful on both fronts, thus resulting in the need for Chapter 11.

### A.   State-Mandated Corporate Split

16.    In October 2009, the Debtor was forced, pursuant to the directive of the New Jersey Department of Human Services, to split its referral agency and childcare center operations

---

[4] Although the Debtor's childcare center license is set to expire on June 13, 2014, the Debtor fully intends/anticipates that same will be renewed, or alternatively, that a deadline extension will be provided by the licensing agency.

into separate legal entities: (A) the Debtor, which continued to operate the childcare centers (Michael's, Barneys) under the original legal name of NJCCCCA; and (B) "4Cs of Passaic County," the Debtor's former referral agency arm, which moved its operations to 2 Market Street in Paterson, New Jersey.

17.    The forced split negatively affected the Debtor's corporate structure, and ultimately revenues, because it resulted in a top-heavy, over-staffed enterprise.  This post-split inefficient corporate framework had an impact on other factors negatively affecting the Debtor, such as the School District's claims for reclamation, which are discussed in greater detail elsewhere herein.

### B. Hurricane Irene and Loss of Barney's

18.    In August 2011, Barney's facility was severely damaged by flooding from Hurricane Irene.

19.    Repairs were performed by Olson Restoration LLC, a Colorado Limited Liability Corporation doing business as ServPro of Greater Boulder ("Servpro").

20.    Although the School District allowed Barney's to temporarily use Michael's facility as Abbott classrooms for the 2011-12 school year, with the understanding that repairs to Barney's facility would be completed by the following school year, the cost to repair Barney's facility far exceeded the Debtor's insurance coverage.

21.    On June 30, 2012, the Debtor was forced to close Barney's, and on March 20, 2013, the Debtor was forced to sell the Barney's facility at a substantial loss.

## C. School District Claims for Reclamation

22.    The School District's budget assigns specific dollar amounts for each assigned expense line item, and at the end of a school year an audit is performed. If funds are not spent as prescribed in the budget, a reclaim of funds is charged against the next year's revenue.

23.    In the past, certain inefficiency issues, such as administrative over-staffing, deficits associated with the infant and toddler programs, and high food costs, caused the Debtor to apply School District funding for non-School District expenses.  This resulted in increasingly high reclaims each successive year which would eventually result in the Debtor not having enough funds to operate the business.

24.    Faced with this dilemma, the Debtor implemented a number of measures, including:

    i.    elimination of redundant administrative positions, such as the CEO and CFO positions;

    ii.    closing of the infant program; and

    iii.    retention of more cost-effective food vendors.

25.    There are also outstanding reclamation claims specifically related to Barney's because after Hurricane Irene caused severe damage to the Barney's facility, the School District continued to provide funding for that center notwithstanding that not all classrooms were moved to the Michael's facility.  The School District did this in order to help the Debtor during a difficult time, and assumed that Barney's would reopen in the following school year, and that any resulting reclaims would then be recouped over an extended period.  However, Barney's never re-opened, and there remains approximately $424,000 in reclaims associated with the Barney's facility.

6

### D. Miscellaneous Inefficiency/Lost Revenue Issues

26.     Up until the past year or so, the Debtor featured a leadership structure that was suited for the pre-split version of the Debtor, but which was too costly for the Debtor following its state-mandated corporate split.  The period of time during which the Debtor was top-heavy resulted in the expenditure of hundreds of thousands of dollars that could have been spent elsewhere.

27.     In addition, the Debtor provided certain services that were not producing sufficient returns, namely infant daycare services.  Such services were discontinued as of June 30, 2013.

28.     The Debtor also encountered errors in its e-child care swipe card system, which – prior to the issue being resolved – resulted in $2,000-$4,000 per month in lost revenue.

29.     Furthermore, miscellaneous other issues, such as rising food costs, contributed to declining revenues.

### E. Lawsuits

30.     The various aforementioned factors leading to bankruptcy had negative cumulative effects on the Debtor's liquidity, which inherently impaired its ability to pay creditors and/or to contest claims against it.  As a result, the following lawsuits have been commenced against the Debtor:[5]

      i.    TD Bank, N.A. v. North Jersey Community Coordinated Child Care Agency, Inc., et al., which was filed on April 29, 2014 in the Superior Court of New Jersey, Passaic County Chancery Division, and pending as Docket No. F-017455-14, on account of a note and mortgage on 101 Oliver Street;

---

[5] The listing of these lawsuits is not intended to serve an admission of liability for any claims raised against the Debtor by way of such litigation.

7

    ii.    <u>Simontacchi Miller & DeAngelis v. North Jersey Community Coordinated Child Care Agency, Inc.</u>, which was filed on April 22, 2014 in the Superior Court of New Jersey, Morris County Law Division, and pending as Docket No. MRS-L-001032-14, on account of alleged services provided to the Debtor in the amount of $60,220.00; and

    iii.    <u>Olson Restoration LLC d/b/a Servpro of Greater Boulder v. North Jersey Community Child Care Agency, Inc. d/b/a Barney's Education Center</u>, formerly pending before the United States District Court for the District of New Jersey as Civil Action No. 12cv2684 (WJM/MF), which resulted in a $200,000.00 consent judgment against the Debtor on account of Servpro's alleged flood repair services provided to the Debtor, and in connection with which an Affidavit of Default under a settlement agreement was recently filed against the Debtor.

## III.    Chapter 11 Goals

31.    Through its Chapter 11 filing, the Debtor seeks to ensure that it will continue to provide critical early education and childcare services to the Paterson community, while still attempting to work with all of its creditors to whatever extent feasible.

32.    The breathing spell afforded by this bankruptcy proceeding is critical in that it will allow the Debtor to effectively reorganize its business operations and affairs free from the duress and financial pressure associated with litigation and other creditor actions.

33.    Once the Debtor has been provided an opportunity to fully engage in the Chapter 11 process, it will begin to formulate a plan to regain its financial footing while also addressing creditor claims.

34.    Contemporaneously with the preparation and filing of a plan of reorganization, the Debtor will implement a number of strategic solutions to become a more viable and efficient enterprise, including:

    i.    streamlining segments of the Debtor's operations to reduce overhead while limiting any negative effects on the quality of services and efficiency of operations;

    ii.    continuing efforts to procure more cost-effective vendors;

    iii.    improving collection of "E-childcare" revenues;

    iv.    more effectively managing the School District's reclaims, including through a multi-year payment plan for reclaims related to Barney's;

    v.    aggressively reducing accounts payable; and

    vi.    potentially seeking capital from a refinancing of the 101 Oliver Street property.

The Debtor is confident that such measures will allow it to regain its financial footing. For instance, prior to the bankruptcy filing, the Debtor's elimination of redundant administrative positions, closing of certain segments and retention of more cost-effective food vendors allowed the Debtor to cut administrative costs by over $200,000 annually while also eliminating a deficit-producing segment of its business.

## IV.    Facts Specifically Relevant to First Day Matters

### A.  Potential Secured Creditor Issues

35.    101 Oliver Street, owned by the Debtor, is potentially subject to the alleged secured claims of TD Bank, N.A. ("TD Bank") and City National Bank of New Jersey ("CNB").

### 1) TD Bank

36.     TD Bank's alleged secured claim originates from a $3.2 million loan conveyed to the Debtor by the New Jersey Economic Development Authority (the "NJEDA") on or about July 22, 1999, and in connection with which the NJEDA issued and delivered a $3.2 million bond in favor of Hudson United Bank.  On or about August 5, 2009, the NJEDA assigned its rights under its loan with the Debtor to Hudson United Bank.

37.     Upon information and belief, TD Bank is the successor by merger with Hudson United Bank.

38.     As of March 19, 2014, TD Bank alleged that it was owed a total of $626,967.86.

### 2) CNB

39.     In or about August 2013, CNB conveyed to the Debtor a $150,000 line of credit.

40.     Upon information and belief, in connection with this line of credit CNB asserts a second mortgage lien position on land, buildings, assignments of leases, rents, fixtures and improvements located at 101 Oliver Street.

41.     Upon information and belief, as of the Debtor's bankruptcy filing, the full amount of the line of credit, $150,000, was owed by the Debtor to CNB.

### 3) Equity Cushion

42.     Assuming arguendo that TD Bank and CNB are secured creditors with validly perfected liens on 101 Oliver Street, a significant equity cushion exists above and beyond their claims.

43.     Specifically, an October 16, 2012 appraisal prepared for TD Bank by The Oxford Group (the "Appraisal") concluded that 101 Oliver Street was worth $3.2 million.  A true and accurate copy of the Appraisal is annexed as **Exhibit A.**

44.    Using the Appraisal, and applying TD Bank's and CNB cumulative claims of approximately $776,967.86, there would remain equity of over $2.42 million.

### 4) Cash Collateral Budget

45.    Again assuming <u>arguendo</u> that TD Bank and CNB are secured creditors with validly perfected liens on 101 Oliver Street, and further assuming <u>arguendo</u> that TD Bank and CNB raise arguments that the Debtor should not be permitted to use its "cash collateral," the Debtor will only use such alleged cash collateral in the ordinary course of its business and in accordance with the budget annexed as **Exhibit B** (the "Budget"), which projects revenues and expenses from May 2014 through December 2014.

### B.  Debtor's Cash Management Systems, Bank Accounts, & Business Forms

46.    Currently, the Debtor has six bank accounts (collectively, the "Bank Accounts"), as follows:

i.    operating account at City National Bank ending in 3073, with a current balance of $7,439.21;

ii.    payroll account at City National Bank ending in 3065, with a current balance of $102,070.08;

iii.    reserve account at City National Bank ending in 7380, with a current balance of $50.00;

iv.    former operating account at TD Bank ending in 5775, with a current balance of $107.83;

v.    former payroll account at TD Bank ending in 5783, with a current balance of $25.00; and

vi.     Hubco loan account at TD Bank ending in 1974, with a current balance of
$44.94.

47.     In the ordinary course of its business the Debtor receives, deposits, and issues
checks and wire transfers into and out of the Bank Accounts.

48.     The Debtor's review of its Bank Accounts over the past six months shows that the
balances therein have not exceeded the FDIC's deposit insurance limits, and that it is highly
unlikely that they will do so in the future.

**C. Debtor's Payroll**

49.     As noted, the Debtor employs 65 employees.  None of the Debtor's employees are
unionized.

50.     Payroll is processed twice a month, in the middle and end of each month (*e.g.,*
15th and 30th of each month) in the amount of $110,000 per pay period, inclusive of all payroll
taxes.

51.     Payroll is processed by Paylocity Corporation, which maintains offices at 77
Brant Avenue, Suite 206, Clark, New Jersey 07066.

52.     The Debtor uses a dedicated payroll account that is held with CNB.

53.     As noted, all payroll taxes are current.

**D. Debtor's Utilities**

54.     The Debtor incurs utility expenses in the ordinary course of business for
electricity, gas, water and fireline services.

55.    The following is a list of the Debtor's utility companies along with the proposed amounts for two-week deposits:

| UTILITY COMPANY | ACCOUNT NO(S) | SERVICE(S) PROVIDED | ESTIMATED TWO WEEK DEPOSIT |
|---|---|---|---|
| PSE&G<br>PO box 14444<br>New Brunswick, NJ 08906-4444 | Account No.<br><br>4200735105 | Electric/GAS | $3,500 |
| Passaic Valley Water Commission | Account No.<br><br>52909-94968 | Water | $84.32 |
| Passaic Valley Water Commission | Account No.<br><br>124613-94970 | Fireline | $154.34 |

### E.  Debtor's Custom Practices

56.    As part of its operations, the Debtor accepts various credit cards as a form of payment, in addition to cash and checks.

57.    The parents, guardians and caregivers of the children served by the Debtor utilize credit cards to pay for such services each and every day.

58.    The frequent use of credit cards by the Debtor's clientele, and the ease of payment by credit cards, make accepting them an essential service for the Debtor's customers.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: May 20, 2014

_A. Grant_
ARNOLD GRANT
FINANCE DIRECTOR

13